**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANGELA GREENWOOD | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 04-3880 |
| | : | |
| WISSAHICKON SCHOOL DISTRICT, et al. | : | |

**MEMORANDUM OPINION**

Savage, J.                                                                                    August 14, 2008

This action exemplifies the inherent tension between the Individuals with Disabilities Education Act's ("IDEA") goal of mainstreaming a disabled student and its requirement to provide an individualized educational program meeting the student's special needs.  It reveals the conflict between the parent's expectations and the school district's educational objectives resulting from their differing perceptions of the student's abilities and needs.  It shows how, despite the best efforts of the parent and the district, inevitable conflict results.  Both want the best education for the student, but disagree on how to achieve it.  Now, the parties ask a court to resolve their differences.

The parent, Susan Greenwood ("parent"), contends that Wissahickon School District ("School District") must add appropriate supplemental aids and services, including facilitated communication, to enable her daughter ("Angela") to participate full-time in regular education.  She also seeks compensatory education.  In essence, the parent contends that anything short of educating her daughter full-time in a regular classroom violates IDEA, as well as Section 504 of the Rehabilitation Act, 29 U.S.C.A. § 794 (2002) ("Section 504"), and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 (1990) ("ADA").

The School District contends that it is currently educating Angela in the least restrictive environment, consistent with the requirements of IDEA, and that no further inclusion is required.  It requests that the decision of the Special Education Due Process Appeals Review Panel ("Appeals Panel") be affirmed.

After an independent review of the entire administrative record and deferring to the credibility findings of the hearing officer, I conclude that the school district is providing Angela with a meaningful educational benefit.  Having been included in the regular classroom to the maximum extent possible, Angela is not entitled to compensatory education.  Nor is facilitated communication an appropriate supplementary aid and service.  Therefore, the Appeals Panel's decision will be affirmed.

## BACKGROUND

Angela is a seventeen-year-old student at Wissahickon High School.  She has been diagnosed with severe mental retardation and static non-progressive encephalopathy.  She has a sensory disorder affecting her ability to sustain focused attention, postural control, and motor planning.  Her eyes do not work together; she has convergence difficulties and double vision.

The dispute originated in July 2003 when the parent requested a due process hearing, complaining that the School District failed to educate Angela in compliance with IDEA. Specifically, she was dissatisfied with Angela's full-time placement in life skills classes operated by the Montgomery County Intermediate Unit because the classes were shifted five times to four different locations outside of Wissahickon Township and the content of the lessons were allegedly inadequate.  She complained that the classes included minimal academic instruction and focused on menial tasks, such as washing

2

tables, spreading peanut butter, and sorting non-functional objects.  She wanted her daughter transferred out of life skills classes and into regular education classes.

After a five-day hearing, the hearing officer ordered the Individualized Education Plan ("IEP") team to add appropriate supplemental aids and services so Angela could participate full-time in regular education in her neighborhood school.  She also ordered the School District to provide 180 days of compensatory education.  The hearing officer, however, determined that Angela was not entitled to "facilitated communication." [1]

Both parties appealed the hearing officer's decision to the Appeals Panel, which modified the hearing officer's decision.  It required the School District to include Angela in lunch, recess, physical education, homeroom, music, art, and at least one academic class using appropriate supplementary aids and services.  The Appeals Panel also ordered the School District to monitor Angela's experience for "fine-tuning in a subsequent IEP meeting."  The Appeals Panel reversed the compensatory education award.

In August 2004, the parent filed this action challenging the Appeals Panel's failure to order the School District to educate Angela in regular classes for most of the school day and to mandate facilitated communication or similar communication mechanisms, as well as reversal of the compensatory education award.[2]  On February 3, 2006, in light of

---

[1]        "Facilitated communication is a technique that allows non-verbal individuals to communicate by having them point to letters (if they can read) or pictures (if they cannot read), with the assistance of a 'facilitator.' The pictures or letters can be on a computer, letter board or word processing program and the facilitator can be a properly trained teacher, parent, or caregiver.  The role of the facilitator is to provide mental support, which includes encouragement but not direction." Special Child Information Avenue Archives: Facilitated Communication, http://www.specialchild.com/archives/ia-014.html. (last visited July 14, 2008).

[2]        Originally, the parent named the School District and twelve individuals as defendants to her complaint. Pursuant to an agreement of the parties, ten of the twelve individual defendants were dismissed from the case entirely.  *See* Jt. Stipulation of Dismissal at ¶¶ 1-2, Feb. 16, 2005 (Doc. No. 11).  However, two of the twelve individual defendants, Judy Clark and Kelle Him-McCloskey, remain defendants in their official capacities. *Id.* ¶ 2.

*Schaffer v. Weast,* 546 U.S. 49, 51 (2005), the case was remanded to the Pennsylvania Bureau of Special Education.  *Greenwood v. Wissahickon School District*, Civ. A. No. 04-3880, 2006 WL 279085 (E.D. Pa. Feb. 3, 2006).

Upon remand, the Office for Dispute Resolution assigned the case to the hearing officer who had presided over the original hearing.  In separate requests, the parties asked the hearing officer to recuse herself, but she declined to do so.  On June 27, 2006, the hearing officer issued a decision that was essentially the same as her earlier one, finding that the School District had violated Angela's right to be educated in a regular classroom to the maximum extent possible and ordered it to convene an IEP team meeting to add appropriate aids and services so Angela could participate full-time in regular education. The hearing officer ordered the School District to provide compensatory education for the period between February 2001 and the end of the 2005-2006 school year.  The hearing officer again rejected the parent's request for facilitated communication.

After the hearing officer issued her decision, the School District met with the parent to revise the IEP.  As a result, the School District drafted a new IEP and Notice of Recommended Educational Placement ("NOREP") for 2006-2007, proposing to place Angela in regular classes at Wissahickon High School for more than five hours a day.  The IEP proposed that Angela be placed in a regular class for core courses, an elective, homeroom, and in a learning support study skills class. The parent agreed to the educational placement.

Meanwhile, both parties filed exceptions to the hearing officer's decision, asserting the same arguments they had raised in the previous administrative appeal. By rotation, the exceptions were assigned to the same Appeals Panel that had previously decided the

parties' exceptions. On August 10, 2006, the Appeals Panel issued a decision reversing the hearing officer and issuing essentially the same decision it had prior to the remand.  It ordered the School District to modify the 2006-2007 IEP to include at least one academic class in regular education and determined that Angela was not entitled to compensatory education.  The Appeals Panel affirmed the hearing officer's decision that Angela is not entitled to facilitated communication.

The action, which had been stayed pending disposition on remand, was removed from suspense.  A courtroom demonstration on facilitated communication was held on January 17, 2007. The parties then filed cross motions for judgment on the record.  After briefing, they engaged in a lengthy mediation process with a magistrate judge that ended in an impasse.  At the parties' request, oral argument was held on May 21, 2008.

## SCOPE OF REVIEW UNDER IDEA

IDEA mandates that every disabled child receive a "free appropriate public education."  20 U.S.C.A § 1412(a)(1)(A) (2005).  Public schools meet this obligation by developing, with the parent's participation, an IEP for the disabled child, which consists of a detailed written statement arrived at by a multi-disciplinary team that summarizes the child's abilities, outlines the goals for the child's education, and specifies the services the child will receive.  *See id.* § 1414(d); 34 C.F.R. § 300.324.

If the parent or the school believes that a child's IEP is inappropriate, either may request an "impartial due process hearing."  20 U.S.C. § 1415(f).  The hearing may be conducted, as determined by state law, by either the local or state educational agency.  *Id.* A state opting to conduct the initial hearing at the local level must provide for a subsequent "independent review" of the hearing officer's "findings and decision" by the state

5

educational agency.  *Id.* § 1415(g).   Pennsylvania has chosen this two-tier system, providing for review of the local agency's decision by a panel of three appellate hearing officers.  22 Pa. Code §§ 14.162(d), (o) (2004).

In reviewing a state agency's ruling, a district court applies a modified *de novo* standard of review.  *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006).  In the two-tier system, like Pennsylvania's, the court starts with the appeals panel's treatment of the hearing officer's findings.  *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 528 (3d Cir. 1995).  The appeals panel must defer to the hearing officer's credibility determinations, but not necessarily to all findings of fact.  *Id.*  Accordingly, where the appeals panel did not accord the requisite deference to the hearing officer's credibility findings, the court may be less deferential to the appeals panel's findings.  *Id.* at 529 n.4.  Nevertheless, even where the appeals panel reversed the hearing officer, the court must still give "due weight" to the appeals panel's findings so long as they are based on contrary non-testimonial extrinsic evidence in the record.  *Id.* at 529.

For purposes of judicial review, administrative factual findings are considered *prima facie* correct; and, the court must explain why it does not accept any of the findings.  *S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260, 271 (3d Cir. 2003).  It may not substitute its own notions of sound educational policy for those of local school authorities.  *Bd. of Educ. v. Rowley,* 458 U.S. 176, 206 (1982).  In essence, the district court cannot disregard what occurred at the administrative level and must respect the findings of those with the educational expertise.

The parent argues that the Appeals Panel ruling should be accorded less consideration because it disregarded the hearing officer's credibility judgments.

6

Specifically, she contends that the Appeals Panel improperly discounted the testimony of her expert witness Alice Udvari-Solner, Ph.D. ("Dr. Solner"), upon which the hearing officer had primarily relied.

The Appeals Panel did not characterize Dr. Solner's testimony as incredible.[3] Rather, it concluded that the record read in its entirety rendered her testimony unreliable. The Appeals Panel's conclusions regarding Dr. Solner's opinions are amply supported by the record. Dr. Solner, a special education teacher from Wisconsin, observed Angela for a single day and readily conceded that she "would need to spend more time with [Angela]" to assess the extent of Angela's disorder because she "wasn't allowed to really speak with her" nor was she "allowed to question anybody.". Consequently, her opinions were based on that one observation and a single 2005 IEP.

Dr. Solner's conclusions are contradicted by other evidence in the record. For example, Dr. Solner testified that during her observation, she found that Angela "behaved like other nondisabled peers," was "appropriate with her vocalizations," and was not distracted. She also testified that she "saw no evidence that students were distracted by [Angela]" and that she "didn't make a conclusion about distractability." The November 2004 and April 2005 NOREPs, however, noted Angela's "undifferentiated vocalizations throughout the day" and tendency to "vocalize in class at inappropriate times." Additionally,

---

[3]     The Appeals Panel had an obligation to "defer to the hearing officer's findings based on credibility judgments unless the nontestimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." *Scott P.*, 62 F.3d at 528; *Bucks County Dep't of Mental Health/Mental Retardation v. Pennsylvania*, 379 F.3d 61, 65 (3d Cir. 2004). Because it questioned whether the hearing officer should have recused herself for lack of impartiality, the Appeals Panel elected to "apply a *de novo* approach, as if [the hearing officer's] entire decision - including her factual findings - were null and void." It is not necessary to determine whether this action was proper because an independent review of the *entire* record indicates that the Appeal Panel's ultimate decision was correct. *See Scott P.*, 62 F.3d at 532 ("The district court could effectively affirm the panel, despite its inability to precisely discern the panel's *ratio decidendi*, by making rulings based on its independent review of the record and the preponderance of the evidence.").

the record is replete with notations of Angela's high distractability. Given the abundance of countering evidence throughout the administrative record, the Appeals Panel's treatment of Dr. Solner's testimony does not merit reversing its decision.

### Facilitated Communication

Despite both the hearing officer and the Appeals Panel having each determined twice that facilitated communication was not appropriate or necessary, the parent insists that the School District provide it. The parent wants facilitated communication available in *every* situation in which Angela has an opportunity to speak, arguing that Angela will not do well in regular class without the use of facilitated communication.

Facilitated communication is not an accepted communication methodology. Even if it were, it is not an appropriate component of Angela's educational program in this case.

The American Psychological Association ("APA") has consistently rejected facilitated communication as an acceptable methodology, and no professional association has endorsed it. Specifically, the APA has determined that facilitated communication is not a scientifically valid communication technique for mentally retarded children. Not a single jurisdiction allows for certification in facilitated communication. Having seen it demonstrated, I cannot endorse facilitated communication as an appropriate means of communication to confer a meaningful educational benefit on Angela.

To support her request, the parent relies on the testimony of three self-proclaimed facilitated communication experts who opined that Angela is a candidate for facilitated communication. However, the evidence does not support a finding that it is appropriate for Angela. She is highly distractible, not only in a noisy environment like a classroom, but also, as exhibited by her behavior in the courtroom, in an orderly environment with minimal

8

distractions.

During the courtroom demonstration, the facilitator acknowledged that Angela had a short attention span and lost focus quickly.  When asked a question, Angela took several minutes to type an answer notwithstanding that the facilitator continuously prompted her and reminded her to stay focused.  Multiple times, Angela was completely distracted, looking around the room or at the ceiling.  The facilitator described this behavior as typical. Despite Angela's poor performance, the parent stated that "today is the most [Angela] has ever talked."  Thus, the evidence does not show that Angela can effectively communicate utilizing facilitated communication.[4]

Parents do not have a right to compel a school district to provide a specific program or employ a specific methodology in educating a student.  *See Rowley*, 458 U.S. at 199 (a free, appropriate public education does not require "the furnishing of every special service necessary to maximize each handicapped child's potential.").  Although a school district is required to provide a free and appropriate education to all disabled children, 20 U.S.C. § 1412, it is not required to provide the *best* possible education to maximize educational benefits.  *Rowley,* 458 U.S. at 197 n.21; *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 178 (3d Cir. 1988).  Nor is a school district required to provide each disabled child an equal educational opportunity commensurate with the opportunities provided other children.  *Rowley, 458 U.S.* at 198; *cf. Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 247 (3d Cir. 1999) (IDEA requires no more than a "meaningful benefit," which "must be gauged in relation to the child's potential." (quoting *Polk*, 853 F.2d at 185)).

---

[4]      Notably, the parties agreed that the Court could determine whether facilitated communication is appropriate based on the January 17, 2007 demonstration.

Facilitated communication is only one type of communication methodology. Although the School District does not use facilitated communication, it does employ other communication methods, one of which is the "Tech Talker." This device allows Angela to press a button either in response to a question or on her own initiative. The Tech Talker contains everyday communication forms that include such basic responses as hello, goodbye, yes, no, need help, all finished, bathroom, and others. These responses are generic and can easily be changed. According to Angela's speech and language pathologist, the appropriate method of communication for Angela should consist of manual hand sign approximations along with communication devices such as the Tech Talker. Relying solely on facilitated communication could cause her to lose ground in other communication skills.

### Mainstreaming Requirement

IDEA requires that a disabled student be educated in the "least restrictive environment" capable of providing a meaningful educational benefit. *Ramsey*, 435 F.3d at 390 (citing *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 578 (3d Cir. 2000)); *S.H. v. State-Operated Sch. Dist.*, 336 F.3d at 265; *see also* 20 U.S.C. § 1412(a)(5)(A). Placing a student in the least restrictive environment, popularly known as mainstreaming, requires a school district to provide the appropriate supplementary aids and services for inclusion in a regular classroom to the greatest extent possible. *See Scott P.*, 62 F.3d at 535. Mainstreaming does not require inclusion in a regular classroom if doing so would jeopardize a student's ability to achieve a meaningful educational benefit. Thus, inclusion is not appropriate when the nature or severity of a student's disability precludes an educational benefit from inclusion with non-disabled students by means supplementary aids

10

and services.  *See* 20 U.S.C. § 1412(a)(5)(A).

The Third Circuit has enunciated a two-part test to determine whether a student has been placed in the least restrictive environment in compliance with IDEA.  *Oberti v. Bd. of Educ. of Clementon Sch. Dist.,* 995 F.2d 1204, 1215 (3d Cir. 1993) (citing *Daniel R.R. v. State Bd. Of Educ.*, 874 F.2d 1036, 1048 (5th Cir. 1989)).  The first prong of the test asks whether the child can be educated satisfactorily in a regular classroom with supplementary aids and services.  *Id.*  The second prong, which comes into play only if it is determined that the disabled student cannot be satisfactorily educated in a regular classroom using supplementary aids and services, assesses the school district's "efforts to include the child in school programs with nondisabled children whenever possible."  *Id.*

In determining whether Angela can be educated satisfactorily in a regular classroom with the use of supplementary aids and services, three factors are considered: "(1) the steps the school district has taken to accommodate the child in a regular classroom; (2) the child's ability to receive an educational benefit from regular education; and (3) the effect the disabled child's presence has on the regular classroom."  *Kingwood Twp.*, 205 F.3d at 579 (citing *Oberti*, 995 F.2d at 1215-17).[5] These considerations aim to resolve the tension within IDEA "between the strong preference for mainstreaming, 20 U.S.C. § 1412(5)(B), and the requirement that schools provide individualized programs tailored to the specific needs of the student."  *Oberti*, 995 F.2d at 1214.

The inquiry starts with an examination of the School District's efforts to accommodate Angela in a regular classroom.   A school district must give serious

---

[5]        "Other factors may be relevant depending on the circumstances of the specific case."  *Oberti*, 995 F.2d at 1218 n.25.  Because the parties have not raised any additional factors, such as cost, only the three factors specified in *Oberti* have been considered here.

consideration to the student's inclusion in a regular classroom with supplementary aids and services.  Mere token gestures for the sake of inclusion will not suffice.  *Oberti*, 995 F.2d at 1216.  The steps taken must result in a meaningful educational benefit.

In this case, the School District has expended substantial time and effort to provide Angela with a meaningful benefit from inclusion in the regular classroom.  In Angela's one regular academic class, social studies, the School District has modified the curriculum to accommodate her in terms of content, quantity, and materials.  Angela's seventh grade social studies teacher testified extensively at the due process hearing about the measures taken to integrate Angela into the class.  During Angela's time in the social studies class, all assignments were modified specifically to help her meet her IEP goals.  A large part of Angela's time in the class focused on the use of flash cards and tying them into the subject being taught.  At all times, she had a one-on-one aide who worked with her on her flashcards, helped prompt her when she was included in the classes' small groups, and helped control any disruptive vocalizations.  The teacher himself spent a considerable amount of time each day with Angela.  He testified that he engaged the student one-on-one at least twice a day, discussing her flashcards, explaining the class material, or clarifying how her cards related to the general curriculum.  Despite having a class of twenty-eight students, he sometimes spent ninety percent of the class time solely with Angela.

In addition to social studies, Angela attended gym, art, music, lunch, technology education, family and consumer science, and an eight-week swimming program at the middle school for seventh and eighth grades.  During eighth grade, Angela was in at least three to four regular education classes per day.  In all of her regular education classes, a one-on-one aide was available to modify the activity.  For example, in gym class, when the

12

regular students were engaged in basketball, Angela and her aide were working on dribbling, bouncing and catching the ball.[6]  Similarly, in the family and consumer science class, she was integrated with forty-six regular education students, and the skills she was asked to perform coincided with those skills from her IEP:  setting the table, stirring, and pouring.

The School District has retained an experienced IEP facilitator who has and continues to assist the parties in the IEP development and revision process.  A one-on-one aide has been assigned to Angela and remains with Angela throughout the school day, including during her regular education classes.  The School District has engaged in substantial, ongoing, and consistent communications with the parent.  It maintains a communication log to ensure that the parent is updated on Angela's progress and to provide a mechanism for the parent to make suggestions.

The parent accuses the School District of failing to adequately train its teachers to provide sufficient mainstreaming.  The parent emphasizes that because "Angela was the first student with significant disabilities whom the [School District] had ever tried to educate in a regular academic class," it should have provided "differentiated instruction" consisting of "how to teach students at varying levels of ability within the same classroom at the same time in the same activity."  Yet, she has not demonstrated how the training is inadequate.  Indeed, to the contrary, each of Angela's teachers has received training that exceeds the requirements for state certification.

Despite these efforts, the parent argues that the School District has failed to

---

[6]      Such modifications were reasonable given that Angela would be at risk in a normal basketball game, because she is unable to anticipate and move when a ball is thrown in her direction.

consider the full range of supplemental aids and services available to educate Angela in a regular classroom full-time.  The record is replete with evidence that the School District provided substantial support to Angela, and the School District has made reasonable efforts to accommodate Angela in a regular classroom.

The next consideration is Angela's ability to get an educational benefit from a regular education.  The inquiry compares Angela's ability to receive a meaningful benefit from inclusion in a regular classroom to the benefit she would receive in a life skills class.  The aim is to assure a satisfactory education that includes relating to fellow students as well as the course content.  *Oberti*, 995 F.2d at 1216.  Hence, it is not only the educational benefit but the social benefit that must be taken into account.  *Id*.[7]

The record establishes that Angela received little, if any, educational benefit from her inclusion in regular class.  The reliable testimony from her teachers demonstrates that her ability to receive educational benefit from regular education is extremely low.  Her seventh grade social studies teacher testified that Angela did not make meaningful educational progress in a regular education class.  She did not come away with an understanding of any of the material from the seventh grade social studies curriculum, even as substantially modified.  Angela's eighth grade teacher similarly concluded that Angela made no progress on any academic goals in her regular education class.

Angela's eighth grade teacher further testified that inclusion in the regular education academic class did not benefit Angela socially, despite the modifications made to accommodate her.  As observed in regular education class, Angela interacted little with the

---

[7]        This consideration includes "the reciprocal benefits of inclusion to the nondisabled students in the class." *Oberti*, 995 F.2d at 1217 n.24.  Inclusion of disabled children may teach the other students the skills necessary to work and communicate with their disabled peers.  *Id*.

other students and needed considerable prompting to elicit participation or a response. While in regular classes, Angela failed to absorb or pick up what the other students were doing; rather, she was totally dependent on her aide.  In her one academic class, social studies, there was minimal or no interaction with the other students.  In fact, the presence of the other students distracted Angela.  As an evaluator testified, when the regular students were engaged in a different activity, it was extremely difficult to keep Angela focused on her task at hand.  However, when Angela was alone with her, it was much easier to cue her.  Thus, Angela's opportunity to learn is diminished in a regular setting where there are other activities and distractions.

Angela has shown little progress in her life skills classes.  The only goals she has met are getting around the building independently, acknowledging people when they stop and say hello, recognition of some letters, dressing skills, hand washing, and sign language.  The little progress she made in the life skills class does not support the conclusion that she should be placed instead in regular education academic classes.

The obligation to provide a free appropriate public education includes the teaching of life skills.  Angela's severe developmental delays mandate that she receive related services, such as speech and language therapy, occupational therapy, physical therapy, and vision support during the school day.  There is limited time during the school day to provide this support when she is in regular classes full-time where she receives little, if any, academic benefit.  Greater inclusion in academic courses compromises any achievement in acquiring essential life skills needed to improve her functional ability.

The record shows that many of Angela's goals cannot be implemented appropriately in a regular education class.  Certain of Angela's life skills goals, such as dressing and

toileting, are simply not appropriate tasks in a regular academic setting.  Additionally, Angela's distractibility, which is heightened in a regular classroom, interferes with the implementation of many of her IEP goals.  In order to accommodate Angela's cognitive limitations and abilities, the School District must modify her regular education program to such an extent that it effectively constitutes a totally different curriculum, thus defeating the purpose of Angela's inclusion in regular class.

Finally, the effect Angela's presence has on the other student's in the regular classroom must be considered.  This factor focuses on the School District's obligation to educate *all* of its students and recognizes that, even if a disabled student might benefit from inclusion, she "may be so disruptive in a regular classroom that the education of other students is significantly impaired.'"  *Oberti*, 995 F.2d at 1217 (internal citations omitted). Additionally, the court must consider whether modifying the curriculum to include Angela "will demand so much of the teacher's attention that the teacher will be required to ignore the other students."  *Id.*

Undisputed testimony shows that Angela's classmates are adversely affected by her conduct.  Angela regularly engages in frequent, loud vocalizations in class.  Her regular education teachers testified that they directly observed the negative impact of her vocalizations on the other students in the classroom.  Angela also engages in other distracting actions in the regular classroom: running her fingers through other students' hair, regularly removing her shoes and socks in class, frequently touching other students, and having toileting difficulties.  Angela's regular teachers testified that these actions interfered with the instructional time for other students in class.  This effect on the other students does not favor full-time inclusion in regular academic classes.

16

All three factors of the first prong of the *Oberti* test support the conclusion that Angela cannot be satisfactorily educated full-time in a regular classroom with supplementary aids and services.  Now, the inquiry turns to the School District's "efforts to include [Angela] in school programs with nondisabled children whenever possible." *Oberti*, 995 F.2d at 1215.

As the above discussion reveals, the School District has expended substantial time and resources to integrate Angela to the maximum extent appropriate.  These efforts are not meaningless nor mere window dressing.  Angela is currently being educated in the least restrictive environment and additional inclusion would hinder Angela's own progress in acquiring essential life skills.

### Compensatory Education

The parent seeks an award of compensatory education.  The purpose of compensatory education is to compensate the student for services to which she was entitled but did not receive due to the School District's failure to provide them.  *Lester H. v. Gilhool,* 916 F.2d 865, 872-73 (3d Cir. 1990).  This right accrues when the School District knows or should know that the student has not received a free appropriate public education.  *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d at 250.  Because Angela has received an IDEA compliant public education, she is not entitled to an award of compensatory education.

### The Rehabilitation Act and The Americans with Disabilities Act

The parent asserts that the School District's failure to educate Angela in the least restrictive environment establishes that she has been unlawfully excluded from regular education in violation of Section 504 and the ADA.  Because "the remedies, procedures

17

and rights" under the ADA are the same as those under Section 504, these two claims are treated as analogous. 42 U.S.C. § 12133; *Jeremy H. v. Mount Lebanon School Dist.*, 95 F.3d 272, 279 (3d Cir. 1996); *Travis G. v. New Hope-Solebury Sch. Dist.*, 544 F. Supp. 2d 435, 445 (E.D. Pa. 2008).

Section 504 of the Rehabilitation Act bars all federally funded entities from discriminating on the basis of disability. 29 U.S.C. § 794; *Jeremy H.,* 95 F.3d at 279. In relevant part, Section 504 states that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Title II of the ADA is similar to Section 504, but extends the nondiscrimination rule of Section 504 to services provided by "any public entity," without regard to whether the entity is the recipient of public funds. 42 U.S.C. § 12132. Accordingly, "the law developed under Section 504 of the Rehabilitation Act is applicable to Title II of the ADA." *Helen L. v. DiDario*, 46 F.3d 325, 330 n.7 (3d Cir. 1995).

The regulations implementing Section 504 adopt language from IDEA, requiring that schools receiving or benefitting from federal financial assistance "shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction." 34 C.F.R. § 104.33(a). The Third Circuit has confirmed that "there are few differences, if any, between IDEA's affirmative duty" to provide a free appropriate public education and Section 504's prohibition of discrimination. *Ridgewood,* 172 F.3d at 253. Therefore, because the School District *did* provide a free appropriate public education in compliance with IDEA, it did not violate Section 504.

18

**42 U.S.C. § 1983**

The parent has also asserted a claim under 42 U.S.C. § 1983, alleging that the School District has acted under the color of state law to deprive Angela of her rights under the Constitution and laws of the United States.  The parent does not address this claim in her motion for judgment on the record.  Indeed, the Third Circuit has held recently that "§ 1983 is not available to remedy violations of IDEA-created rights" or violations of rights under Section 504.  *A.W. v. Jersey City Schools*, 486 F.3d 791, 802-03, 806 (3d Cir. 2007).

**CONCLUSION**

Based upon a reading of the record in its entirety, there is no reason to disturb the Appeal's Panel's decision.  Therefore, it will be affirmed.[8]

---

[8]    Because the parent is not a prevailing party in this action, her demand for attorneys fees is denied.  *See* 20 U.S.C. § 1415(i)(3)(B)(I); *D.R. v. East Brunswick Bd. of Educ.*, 109 F.3d 896, 902 (3d Cir. 1997).